2025 IL App (1st) 231559-U

FIFTH DIVISION
August 22, 2025

Nos. 1-23-1559 & 1-23-1560 (cons.)

NOTICE: This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | Nos. 14 CR 60032 |
| | ) | 14 CR 60033 |
| DEVIN ALDRIDGE, | ) | |
| | ) | Honorable |
| Defendant-Appellant. | ) | Thomas J. Byrne, |
| | ) | Judge Presiding. |

PRESIDING JUSTICE MIKVA delivered the judgment of the court.
Justices Oden Johnson and Mitchell concurred in the judgment.

**ORDER**

¶ 1 *Held*: We affirm the defendant's conviction and reject his arguments that he is entitled to a new trial because of the admission of parole records that listed him as an offender and because of the State's closing argument.

¶ 2 After a jury trial, defendant Devin Aldridge was convicted of first degree murder and sentenced to natural life in prison. On appeal, Mr. Aldridge argues that his conviction should be reversed and this matter remanded for a new trial because (1) it was unfairly prejudicial for the trial court to allow the State to introduce records identifying him as an "offender" on parole, and (2) the State's closing and rebuttal arguments were improper and deprived him of a fair trial. For

the following reasons, we affirm.

¶ 3                                    I. BACKGROUND

¶ 4     This case stems from two shootings that occurred in Chicago within an hour of each other in the early morning of December 19, 2013. At approximately 4:40 a.m., 74-year-old Willie Cooper (case No. 14 CR 60032) was shot and killed as he sat in his car at 7017 South East End Avenue, and at approximately 5:30 a.m., 41-year-old Eric Davis (case No. 14 CR 60033) was shot in his car at 67th Street and East End Avenue. Mr. Aldridge and his codefendant Mark Hall, who is not a party to this appeal, were eventually charged with the first degree murders of both men. Because the cases were factually intertwined, they were tried simultaneously, Mr. Aldridge's before a jury and Mr. Hall's in a bench trial.

¶ 5                                 A. The Parole Records

¶ 6     The question of whether certain parole records could be admitted in order to connect Mr. Aldridge to a specific phone number and, if so, to what extent those records should be redacted were issues raised at various points throughout pretrial proceedings and during the trial. We have consolidated the discussions of that question here, before turning to the evidence presented at trial.

¶ 7     Before trial, Mr. Aldridge moved *in limine* to bar any testimony or evidence "that he used or identified as his own the number 773-425-2790 [(the 2790 number)] while incarcerated in the Illinois Department of [C]orrections [(IDOC)]."

¶ 8     At the hearing on the motion, by way of proffer, the State explained that Mr. Aldridge listed the 2790 number "as an alternative phone number to his parole agent," that it was the number "that [its] cell expert w[ould] testify to was near the crime scenes at the time of the crime[s]," and that the 2790 number was therefore relevant to the issue of identity. The State intended to call a parole officer to introduce Mr. Aldridge's "admission" that the 2790 number was his phone

number. The State also said that after Mr. Aldridge was arrested, he attempted to distance himself from that phone number to the police—he was shown his offender data sheet from parole which listed information, including the alternative phone number, and said he did not know "how they got that" number. Defense counsel argued that the 2790 number belonged to Mr. Aldridge's cousin, not to Mr. Aldridge.

¶ 9    In ruling, the trial court said:

"As far as the defendant's statement regarding an address and a phone number, particularly when he distanced himself or denies that phone number at a later date, that statement I'm not going to—the statement of the defendant to a parole officer, I'm not going to preclude, and I'm not going to limit the State in calling the parole officer and identifying himself as such. You're not going to go into the circumstances of the discharge or the parole in particular, or the matter in which he was on parole in your case in chief."

The court also said that the parole officer would be allowed to identify himself as such and "[t]he reason he's collecting that information I think is appropriate and not unduly prejudicial."

¶ 10    At a subsequent court date, the State notified the trial court that it had produced additional discovery, including parole records from the IDOC. The State represented that "an individual from a corporation that does the technical work for the [IDOC] *** could authenticate those records just with respect to the phone number that Mr. Aldridge was using during that period of time."

¶ 11    On the day trial began, defense counsel indicated that the State had tendered "71 pages of parole records which basically document[ed] Mr. Aldridge's contact with his parole officer." Defense counsel argued that introduction of the entire 71 pages of parole records was hearsay and not in line with the trial court's prior ruling in regard to the parole records.

¶ 12    The State said that the records were kept for IDOC by a company called BI, and it planned

to introduce them as business records. The State explained that parolees are required to call and check in, then the computer system "records the number that they are calling from and puts it on the parole record" and, sometimes, the parolee "is asked on the phone to verbally give the number that they are calling from." The State said that because IDOC was unable to provide the name of the person to whom Mr. Aldridge provided the phone number, it "sort of settled on these records." According to the State, the parole records showed that Mr. Aldridge used the 2790 number to check in on "about 10 or 15 different occasions" and gave the number himself on "at least 3 or 4 of those occasions."

¶ 13    Defense counsel objected to the records being admitted as business records because they were "kept for the purposes of charging someone with violating their parole." But if the records were admitted, the defense requested that they be "extremely redacted because there [wa]s a lot of information in [t]here that the jury should not hear."

¶ 14    The court found that, with a proper foundation, the parole records fell under the business records exception to the hearsay rule and that they were relevant to the issue of whether the 2790 number "[wa]s linked directly to [Mr. Aldridge]." The court emphasized, however, that "the only admissible purpose of any parole records" would be connecting Mr. Aldridge with the 2790 number—"not parole violations, not late reporting or anything of that nature"—and directed the parties to make the necessary redactions. The court also restated that it would not "require the [S]tate to hide or shield the identity of the parole officer."

¶ 15    On the first day of trial, after the jury was dismissed, the court reiterated that it expected testimony "where the word parole or parole officer with regard to Devin Aldridge's case is mentioned in front of a jury," and asked whether defense counsel wanted a limiting instruction. Defense counsel responded that she did not think that testimony should come in and, furthermore,

that a limiting instruction would not "undo the damage that's going to happen." The court said that the Illinois Pattern Jury Instructions (Criminal) (IPI) recommended a limiting instruction where evidence of other crimes is introduced and clarified that the 2790 number was being introduced for identification purposes. Defense counsel agreed to the limiting instruction.

¶ 16    Just before the State introduced the parole records through the testimony of Janet Marshall, keeper of the parole records, defense counsel renewed her objection, arguing the word "offender" should be removed from the records, which listed several of Mr. Aldridge's "offender call[s]" and "offender check-in call[s]." The State responded, "[I]f you take out the word offender, you're taking out the subject of who is making that call, who is making that check in. At that point, it's a blank area saying check in or blank area called, instead of saying who made that call. It might confuse the jury." The trial court overruled the objection, stating that it did not find the word "offender" to be "unduly prejudicial in light of the efforts that ha[d] been made to limit those documents just to the specific issue," and noting that a limiting instruction would be given after Ms. Marshall's testimony.

¶ 17                                    B. Trial

¶ 18    Trial began on October 12, 2022. The following evidence was presented.

¶ 19                    1. Law Enforcement Witnesses and Forensic Evidence

¶ 20    The State presented the testimony of several police officers who responded to the scenes of the shootings on December 19, 2013. Officers first responded to a call of shots fired at approximately 4:40 a.m. in the area of 7017 South East End Avenue, where they found Mr. Cooper slumped over with multiple gunshot wounds inside a grey Chevy Malibu that had crashed into a fence. The driver's side door and window had multiple bullet holes, and seven spent 9-millimeter shell casings were recovered from behind the car on the driver's side. Officers responded to a

second call of shots fired at approximately 5:30 a.m. at the 6700 block of East End Avenue, where they found Mr. Davis slumped over in the driver's seat of a black Chevy Monte Carlo that had crashed into another car. There were bullet holes in the driver's side door, the driver's side window was shattered, and five fired 9-millimeter shell casings were recovered from "just a little south" of the vehicle. Both men were pronounced dead at the scene; autopsies concluded that they each died from multiple gunshot wounds and that the manner of their deaths was homicide.

¶ 21    A firearms identification expert determined that the shell casings recovered from both scenes had been fired from the same weapon. Fired bullets recovered from the bodies of the two men had also been fired from the same weapon.

¶ 22    The police canvassed the three-block area between the two crime scenes and obtained surveillance footage from at least seven buildings. This court has viewed the videos, which show two individuals walking near the area of the shootings starting at approximately 4:11 a.m., then at approximately 4:44 a.m., two individuals are caught on camera approaching Mr. Cooper's car— one on the driver's side and the other on the passenger's side—followed by a flash. The two individuals then run away. At 5:16 a.m., a camera captured two individuals walking around the corner from where Mr. Davis was murdered, before two individuals are seen at approximately 5:23 a.m. on another camera approaching the driver's side of Mr. Davis's car. Then Mr. Davis's car drives away while the two individuals flee.

¶ 23    The State presented a Power Point presentation along with the surveillance footage while detectives narrated, explaining the camera locations and the specifics of what each video showed. The State also showed maps of the neighborhood that indicated the location of each murder and each surveillance camera, and the directions the two individuals were seen traveling on the surveillance footage. Detectives described the two individuals shown in the surveillance footage

as Black men—one taller and thinner and another shorter and stockier. The detectives testified that they believed each video showed the same two individuals.

¶ 24    The detectives created a community alert flyer using images of the two individuals' faces captured from one of the videos. Detectives showed the flyer around the community but received only anonymous tips. Eventually, the detectives came to believe that the individuals were Mr. Aldridge and Mr. Hall and approached friends of Mr. Aldridge and Mr. Hall with the flyer. They learned about the 2790 number and obtained records showing the ingoing and outgoing calls that occurred on that phone and where the phone was located at the time of the murders. The listed subscriber for the 2790 number was Bill Clintonton, with an address of 7344 South Stony Island Avenue in Chicago. The detectives were unable to identify or find Mr. Clintonton, leading them to believe that the phone was a burner phone.

¶ 25    Janet Marshall, the director of operations at Boulder Incorporated (BI), testified that her company "provide[d] case management and electronic monitoring and GPS services to different [s]tate agencies" and that IDOC had been a client since 1994. Ms. Marshall explained that BI had a 24-hour contact center. Each participant was provided with a toll-free phone number to call, and their calls were answered by either a live agent or an interactive voice response (IVR) system. If a participant speaks with an agent, the participant provides the phone number they are calling from, and the agent inputs that number into the system and "take[s] it from the Caller ID as well." If the participant interacts with the IVR system, the system records the number from caller ID.

¶ 26    Ms. Marshall identified Mr. Aldridge's redacted history report, which was admitted and published to the jury over defense counsel's objection. The history report showed when an "offender check-in call" or "offender call" was made. The unredacted portions of the report showed that between July 29, 2013, and February 16, 2014, Mr. Aldridge called BI's contact center

from the 2790 number a total of 24 times, verbally confirming that number with an agent during 12 of those calls; between August 8, 2013, and January 1, 2014, he only called from the 2790 number. On December 11, 2013, Mr. Aldrige also requested that an agent call him at the 2790 number. After the call on January 1, 2014, he then called from several different numbers until January 31, 2014, at which time he informed an agent that his new cell phone number was 872-800-2885.

¶ 27    After Ms. Marshall's testimony was complete, the court instructed the jury as follows:

> "Ladies and gentlemen, evidence has been received that [Mr. Aldridge] has been involved in conduct other than that charged in the indictment. This evidence has been received on the issue of [Mr. Aldridge's] identification and may not be considered by you—and may be considered by you only for that limited purpose. It's for you to determine whether [Mr. Aldridge] was involved in that conduct and what weight should be given to this evidence on the issue of identification."

¶ 28    Joseph Raschke, a special agent with the FBI and an expert in the field of cell site analysis, testified that, at the State's request, he completed a historical cell site analysis to determine the general area where the phone associated with the 2790 number was located between 3 and 7 a.m. on December 19, 2013. He determined from his analysis that between 3 and 5 a.m. on December 19, 2013, there were four outgoing calls—at 3:16, 3:17, 3:47, and 4:51 a.m.—all of which used two cell towers in the same general area as where the murders occurred. Additional calls occurred at 5:02, 5:09, 5:20, 5:21, and 5:26 a.m. using the same two cell towers. Starting at 5:47 until 5:59 a.m., there were several outgoing calls using a different tower, located south of the murders, "consistent with the phone having moved south toward the area near that [t]ower." Between 6 and 7 a.m., there were three more calls, and the towers used were "no longer consistent with the phone

being in the area that would include those relevant locations." Agent Raschke agreed on cross-examination that cell tower data only provides a general idea of where a cell phone might be, not an exact location.

¶ 29    The cell phone records for the 2790 number, showing the phone numbers for calls that were made to or from that number, were admitted by stipulation.

¶ 30                                    2. Roland Miller

¶ 31    Roland Miller testified that he lived in a third and fourth floor bilevel condominium at 7000 South East End Avenue and was awakened by gunshots at approximately 4:43 a.m. on December 19, 2013. He grabbed his phone to call 911 as he moved to look out of his bedroom window, where he saw two Black men beneath his window running north on East End Avenue toward 70th Street. One was taller; the other was shorter and heavier set. Mr. Miller said there was a streetlight immediately next to his building as well as several streetlights at the intersection of East End Avenue and 70th Street. He could only see the back of the taller man, but the shorter, heavier man had his head tilted upward and Mr. Miller saw his face. The man appeared to be laughing. Once the two men were out of view, Mr. Miller said he looked toward the entrance of a parking lot across the street and just south of his building—the direction from where he had heard the gunshots—and saw "a car sliding slowly forward and crashing into the gate" of the parking lot. When shown the community alert flyer, Mr. Miller was able to identify the individual on the right as the shorter of the two men he had seen run by his window.

¶ 32                            3. Aprill Williams and Jamal Trussell

¶ 33    Aprill Williams and Jamal Trussell provided additional identifications for the police. Ms. Williams testified that when detectives came to her home and showed her a flyer with two pictures on January 12, 2014, she identified the individual on the left side of the flyer as Mr. Hall, who she

said she had seen for years in the neighborhood. During her recorded interview at the police station on July 27, 2014, and again before the grand jury on August 22, 2014, she once more identified Mr. Hall as the person in the left-side picture on the community alert flyer. She also identified him from video footage shown to her at the police station.

¶ 34    Mr. Trussell said that he knew Mr. Aldridge and Mr. Hall from school and saw them in the neighborhood "fairly often." On July 17, 2014, he viewed the community alert flyer at the police station and identified Mr. Hall as the person shown in the picture on the left and wrote "looks like Devin Aldridge" under the picture on the right. Mr. Trussell also was shown video footage that showed two individuals walking through a gangway or alley, and said that, to the best of his knowledge, one looked like Mr. Hall and the other like Mr. Aldridge. Mr. Trussell made these same identifications during a video recorded statement he gave that day and before the grand jury on August 9, 2014.

¶ 35                    4. The Recanting Witnesses

¶ 36    Katina Walton, Khalia Welsh, Devin Huddleston, and Theresa Randle all initially gave statements, grand jury testimony, or both, that supported the State's case but recanted in full or in part at trial. These prior statements were admitted as substantive evidence. See 725 ILCS 5/115-10.1 (West 2022).

¶ 37                    a. Katina Walton

¶ 38    According to Detective Roberto Garcia, who spoke with Katina Walton on March 31, 2014, at her mother's home and with her mother present, Ms. Walton said that she had known both Mr. Aldridge and Mr. Hall since they were kids because they were in school with her brother, and she saw them "almost on a daily basis" in the neighborhood. Ms. Walton spoke with ASA McCarthy at the police station on July 17, 2014, with Detective Garcia present, and gave a recorded statement,

10

which was played for the jury, and in which she identified Mr. Aldridge and Mr. Hall as the two men depicted in the community alert flyer—Mr. Aldridge on the right and Mr. Hall on the left. ASA Glendon Runk testified that Ms. Walton gave testimony consistent with that statement before the grand jury on August 19, 2014. At all times Ms. Walton agreed that she had been treated well by the police and not threatened.

¶ 39     At trial, Ms. Walton's testimony about December 19, 2013, was largely consistent with her prior statements. When she was initially asked at trial if, when the police showed her the community alert flyer on July 17, 2014, she recognized the individuals on it, she said she did. Ms. Walton then insisted, however, that Detective Garcia had forced her to identify Mr. Aldridge and Mr. Hall as the men shown in the flyer. "He told me that I knew who those people were and that they was [*sic*] going to put a warrant out for my arrest if I didn't tell them who those people were." When asked again at trial whether it was Mr. Aldridge and Mr. Hall shown in the community alert flyer, Ms. Walton said: "I don't recall if that's them or not. I don't know. The pictures are blurry and everything, so I don't know. I was scared and I was threatened. I know that." She also believed she was probably under the influence of drugs or alcohol when she testified before the grand jury.

¶ 40                              b. Khalia Welsh

¶ 41     ASA Mariano Reyna testified that when he spoke to Ms. Welsh before presenting her to the grand jury on July 25, 2014, she identified Mr. Aldridge as the person shown on the right and Mr. Hall as the person shown on the left of the community alert flyer. She then identified each from separate color photographs and video footage. Ms. Welsh repeated the photo identifications before the grand jury. She explained that Mr. Hall was her boyfriend of three years and that they shared a daughter. On December 19, 2013, Mr. Hall texted her from a number she recognized "because it said Lemon, his friend," and that Lemon's real name was Devin Aldridge, whom she

11

had known since they were in approximately sixth grade. Mr. Hall did not have his own phone and often contacted her using Mr. Aldridge's phone. She again identified Mr. Aldridge and Mr. Hall on the community alert flyer and in the photographs before the grand jury.

¶ 42    At trial, however, Ms. Welsh denied having Mr. Aldridge's number in her phone in 2013 because they were "not that acquainted." She could not recall anything from the morning of December 19, 2013, her conversation with police, meeting with an ASA, testifying before the grand jury, or previously identifying Mr. Aldridge or Mr. Hall.

¶ 43    According to the phone records for the 2790 number, numerous calls were made between that number and Ms. Welsh's phone number, from December 17 through 19, 2013.

¶ 44                                c. Devin Huddleston

¶ 45    Detective Garcia and ASA McCarthy both testified that, on July 16, 2014, they spoke with Mr. Huddleston at the police station. ASA McCarthy testified that Mr. Huddleston identified Mr. Aldridge and Mr. Hall from photos, including the community alert flyer, and from a video he was shown. He also gave a recorded statement, which was played for the jury. In it, he talked about going to Mr. Aldridge's apartment on an unspecified date and inspecting a 9-millimeter handgun that he wanted to buy, but Mr. Aldridge would not sell it. On December 18 through 19, 2013, Mr. Huddleston slept at his girlfriend's house in Indiana, and on the morning of December 19, 2013, he noticed he had missed two calls from Mr. Aldridge at approximately 1:45 a.m. and called Mr. Aldridge back at approximately 8:30 a.m. Mr. Aldridge did not answer. Mr. Huddleston said he did not know Mr. Aldridge's phone number by heart, but that it was stored in his phone. A day or so later, Mr. Aldridge called and said he would sell the gun for $750. By the time Mr. Huddleston came up with the money after a day or two, Mr. Aldridge said he had already sold the gun. Mr. Huddleston said he had identified Mr. Aldridge and Mr. Hall in a video shown to him by Detective

Garcia. Mr. Huddleston testified before the grand jury on August 15, 2014, consistently with his video recorded statement. On both occasions he said he had been treated well by police and the ASAs and was not threatened to give a statement or testify.

¶ 46    At trial, Mr. Huddleston could not remember the phone number he had in 2013 and said he probably had Mr. Aldridge's phone number at the time but did not know it off the top of his head. He then said he did not recall attempting to buy a gun from Mr. Aldridge, did not remember the events of December 18 or 19, 2013, did not recall speaking with Detective Garcia or ASA McCarthy, did not remember giving a recorded statement, and although he did remember testifying before the grand jury, did not recall what he said. Mr. Huddleston also said that the police harassed him and "[k]ept locking him up for no reason, sticking him in holding cells for 24 to 48 hours and not even saying anything," that he was "[c]onstantly getting pulled over, being detained, questioned over and over again," and that he lost a job due to being detained for two days. He filed a report with "OPS" and said the harassment calmed down after he did so. He did not tell the ASAs he spoke to about the police harassment.

¶ 47    According to the phone records for the 2790 number, three calls were made to Mr. Huddleston's phone number on December 17, 2013, and seven calls were made between the two numbers on December 19, 2013.

¶ 48                                    d. Theresa Randle

¶ 49    ASA McCarthy testified that when he spoke with Theresa Randle at the police station on July 22, 2014, she declined to give a video-recorded interview but gave a written statement. In that statement, Ms. Randle said that she and Mr. Aldridge were " 'friends with benefits' " starting when she met him in 2009, and they had a relationship until March 2014. According to Ms. Randle, Mr. Aldridge's phone number "was at first 773-425-2790, and she would call him on it, but then in

February or January of 2014, he got another number that started with 847." Ms. Randle met Mr. Hall, Mr. Aldridge's friend, a year or two later. She identified Mr. Aldridge as the person shown in the picture on the right side of the community alert flyer and Mr. Hall as on the person shown on the left. She also identified separate color photos of each man. In her statement, Ms. Randle also said she watched a video clip at the police station that "show[ed] two guys walking one behind the other thru a walkway or gangway" and identified the man in front as Mr. Aldridge and the man behind him as Mr. Hall. ASA Runk testified that Ms. Randle's testimony before the grand jury on August 13, 2014, was largely consistent with her handwritten statement. In both, she said she had been treated well by the police and ASAs and had not been threatened or promised anything in exchange for her statement or testimony.

¶ 50    At trial, Ms. Randle acknowledged that she had had a relationship with Mr. Aldridge and knew Mr. Hall. She also said that she could have recited Mr. Aldridge's phone number in 2014 but did not know it at the time of trial. Ms. Randle, however, denied giving a handwritten statement or testifying before the grand jury. She was shown her handwritten statement and although she identified her signature on every page of it, said she had never seen the document before. When asked whether she recognized the 2790 number, she said, "Well, I don't recognize any number on here, but that's the number that's on here that it said it was his at the time, so I guess so."

¶ 51                    5. Deliberations, Posttrial Motions, and Sentencing

¶ 52    Defense counsel moved for a directed finding at the close of the State's case, which the trial court denied. The defense then also rested.

¶ 53    After closing arguments and before deliberations began, the trial court instructed the jury as follows:

    "Closing arguments are made by the attorneys to discuss the facts and circumstances in the

14

case and should be confined to the evidence and to reasonable inferences to be drawn from the evidence. Neither opening statements nor closing arguments are evidence. Any statement or argument made by the attorneys which is not based on the evidence, should be disregarded."

¶ 54 The trial court also reiterated its limiting instruction regarding the parole records:

"Evidence has been received that the defendant has been involved in conduct other than that charged in the indictment.

This evidence has been received on the issue of the defendant's identification and may be considered by you only for that limited purpose.

It is for you to determine what weight should be given to this evidence on the issue of identification."

¶ 55 After deliberating for approximately four hours, the jury found Mr. Aldridge guilty of the first degree murders of Mr. Cooper and Mr. Davis.

¶ 56 On November 16, 2022, Mr. Aldridge's trial counsel filed a form motion for a new trial while waiting for transcripts. On May 30, 2023, Mr. Aldridge, through new counsel, filed an amended 33-page motion for new trial. In that motion, Mr. Aldridge did not challenge the propriety of the State's closing argument. He did, however, argue that the court erred in allowing the parole records into evidence, allowing testimony about the records, and in not requiring the State to redact the word "offender" from the records. Counsel argued the same at the hearing on the motion.

¶ 57 The trial court denied the motion and sentenced Mr. Aldridge to natural life in prison.

¶ 58 This appeal followed.

¶ 59 II. JURISDICTION

¶ 60 Mr. Aldridge was sentenced on August 16, 2023, and timely filed his notice of appeal in

each case—the murder of Eric Davis (appeal No. 1-23-1559) and the murder of Willie Cooper (appeal No. 1-23-1560)—that same day. On June 25, 2024, we granted his motion to consolidate. We have jurisdiction over these consolidated appeals pursuant to article VI, section 6, of the Illinois Constitution (Ill. Const. 1970, art. VI, § 6) and Illinois Supreme Court Rules 603 (eff. Feb. 6, 2013) and 606 (eff. March 12, 2021), which together govern appeals from final judgments in criminal cases.

¶ 61                                    III. ANALYSIS

¶ 62                 A. Prejudice Resulting from Admission of the Parole Records

¶ 63    Mr. Aldridge first argues that the trial court erred when it allowed the State to introduce evidence from the IDOC parole records labeling him as an "offender" because it "served only to paint [him] as a criminal deserving of punishment" and was therefore unduly prejudicial.

¶ 64    Although the parties analyze this, at least in part, as "other crimes" evidence under Illinois Rule of Evidence 404(b) (eff. Jan. 1, 2011), that rule really pertains to evidence that is designed to demonstrate that a defendant committed some other crime or bad act, so long as it is not relied on by the State to demonstrate that the defendant acted "in conformity" with it. In this case, the prejudicial fact that these records reflected Mr. Aldridge's criminal past was collateral to the relevant fact that Mr. Aldridge had used this telephone number around the time of the alleged crimes. Thus, rather than a Rule 404(b) question, the admission of this evidence raised a classic Rule 403 question.

¶ 65    Under Illinois Rule of Evidence 403 (eff. Jan. 1, 2011), "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice." Here, the trial court cited "identity"—one of the permissible reasons that other crimes evidence may be admissible under Rule 404(b)—but underlying the judge's analysis and his concern as to

whether the State could match this phone number to Mr. Aldridge without this evidence, was the precise weighing of relevance against unfair prejudice required by Rule 403.

¶ 66  The admissibility of evidence is generally entrusted to the trial court, and its decision will not be reversed absent an abuse of that discretion. *People v. Pikes*, 2013 IL 115171, ¶ 12. A trial court abuses its discretion only when its ruling is arbitrary, fanciful, unreasonable, or no reasonable person would have taken the trial court's view. *People v. Cerda*, 2021 IL App (1st) 171433, ¶ 98. Here, we do not find the court abused its discretion in admitting the parole documents along with Ms. Marshall's testimony. Connecting Mr. Aldrige to the 2790 number was persuasive evidence that Mr. Aldridge was in the area of the crimes when they occurred, and the fact that Mr. Aldridge called to check in from the 2790 number on numerous occasions, along with his verbal confirmations on several of those occasions that he was calling from that number, was strong evidence of that connection.

¶ 67  Mr. Aldridge primarily argues that the parole documents and Ms. Marshall's testimony were unnecessary because the statements or grand jury testimony of Ms. Walton (we assume he means Ms. Welsh), Ms. Randle, and Mr. Huddleston, which came in as substantive evidence under section 115-10.1 of the Code of Criminal Procedure of 1963 (725 ILCS 5/115-10.1 (West 2022)), already connected him with the 2790 number. However, this evidence was far from conclusive.

¶ 68  At trial, all three witnesses denied knowing Mr. Aldridge's phone number. In their pretrial statements, neither Ms. Welsh nor Mr. Huddleston ever actually provided Mr. Aldridge's phone number; rather, they said that they had Mr. Aldridge's number stored in their phone. The State introduced phone records showing calls between the 2790 number and both Ms. Welsh and Mr. Huddleston, but this only circumstantially connected Mr. Aldridge to the phone number.

¶ 69  Ms. Randle said clearly in her handwritten statement that "Lemon's phone number was at

first 773-425-2790," and again in her grand jury testimony that Mr. Aldridge's phone number was 773-425-2790, and that she called him at that number until early 2014, when he changed phone numbers. At trial, when Ms. Randle was shown her handwritten statement where the number was written out, she said, "I don't recognize any number on here, but that's the number that's on here that it said it was his at the time, so I guess so." The strength of this evidence—a prior statement that was admitted substantively but undermined at trial was not so clear and uncontroverted that we can find that admitting Ms. Marshall's testimony and the BI history report was an abuse of discretion.

¶ 70    Mr. Aldridge cites *People v. Walker*, 211 Ill. 2d 317, 339 (2004), for the proposition that the State "has no entitlement or right to present evidence that is unfairly prejudicial when equally probative, nonprejudicial evidence is available and will serve the same purpose." In *Walker*, however, the State needed to show only that the defendant had a prior felony conviction, and the defendant had offered to stipulate to his felon status. *Id.* at 328, 337. As our supreme court noted:

> "[T]he evidentiary significance of the record of conviction is indistinguishable from that of the stipulation, except that one creates a substantial risk of prejudice and the other does not. Thus, once a stipulation is offered, the State has alternative evidence that is equally probative of the element which the State has an obligation to prove." *Id.*

But *Walker* was different. The evidentiary significance of Ms. Randle's prior statement, which she contradicted at trial, is *not* indistinguishable from the combined value of the history report and Ms. Marshall's testimony.

¶ 71    Mr. Aldridge specifically claims prejudice from the fact that he is referred to as an "offender" in the history report, which he contends was unduly prejudicial. Evidence is unduly prejudicial if it casts a negative light on a defendant for reasons that have nothing to do with the

18

case at hand. *People v. Gordon*, 2017 IL App (3d) 140770, ¶ 25. As the State argued in the trial court, if the word "offender" had been redacted, it would have been unclear to the jury who was making the call from the relevant phone number. The trial court also instructed the jury—both after Ms. Marshall's testimony and again before deliberations—that the evidence was to be considered only for the limited purpose of identification. We presume that a jury has followed the instructions that were given to it. *People v. Taylor*, 166 Ill. 2d 414, 438 (1995). On this record, we find no abuse of discretion in the trial court's admission of the history report or Ms. Marshall's testimony explaining that report.

¶ 72                    B. The State's Closing Argument

¶ 73    Mr. Aldridge next argues that in its closing argument the State "insinuated, without any basis in the evidence, that the witnesses who recanted their identifications of [Mr.] Aldridge" did so because they were afraid of Mr. Aldridge. Mr. Aldridge argues these statements were highly prejudicial and deprived him of a fair trial.

¶ 74    " 'The purpose of closing arguments is to give the parties a final opportunity to review with the jury the admitted evidence, discuss what it means, apply the applicable law to that evidence, and argue why the evidence and law compel a favorable result.' " *People v. Nicholas*, 218 Ill. 2d 104, 121 (2005) (quoting T. Mauet & W. Wolfson, Trial Evidence 439 (2d ed. 2001)). "A prosecutor has wide latitude in making a closing argument" and "may comment on the evidence and any fair, reasonable inferences it yields [citation], even if such inferences reflect negatively on the defendant." *Id.* In addition, "[a] closing argument must be viewed in its entirety, and the challenged remarks must be viewed in their context." *Id.* at 122.

¶ 75    We first address the appropriate standard of review. Citing our supreme court's decision in *People v. Wheeler*, 226 Ill. 2d 92, 121 (2007), Mr. Aldridge contends that we should review this

claim *de novo* because this claim presents a "purely legal" question. The State, quoting this court's decision in *People v. Davis*, 2018 IL App (1st) 152413, ¶ 68, argues that " 'a reviewing court applies an abuse of discretion analysis to determinations about the propriety of a prosecutor's remarks during argument,' but 'reviews *de novo* the legal issue of whether a prosecutor's misconduct, like improper remarks during argument, was so egregious that it warrants a new trial.' "

¶ 76    In many decisions of this court we have, for some time now, found an apparent conflict created by our supreme court's decisions in *People v. Blue*, 189 Ill. 2d 99 (2000), and *Wheeler*, 225 Ill. 2d 92. See, *e.g.*, *People v. Green*, 2017 IL App (1st) 152513, ¶ 78 (collecting cases). In *Blue*, the court applied without comment the standard established in earlier cases that "[t]he regulation of the substance and style of closing argument is within the trial court's discretion, and the trial court's determination of the propriety of the remarks will not be disturbed absent a clear abuse of discretion." *Blue*, 189 Ill. 2d at 128. But in *Wheeler* the court noted—with no indication that it was establishing a new standard of review—that "[w]hether statements made by a prosecutor at closing argument were so egregious that they warrant a new trial is a legal issue [the] court reviews *de novo*." *Wheeler*, 226 Ill. 2d at 121. Other decisions have thought to reconcile the two cases, recognizing that the appropriate standard should be dictated by the nature of the decision we are called on to review. See, *e.g.*, *People v. Cook*, 2018 IL App (1st) 142134, ¶¶ 63-64.

¶ 77    More recently, our supreme court again considered the issue of improper comments in closing argument and, without acknowledging any apparent conflict, stated:

> "Because an error in closing arguments is *sui generis*, we have created a unique two-step process for determining whether a court's decision to overrule a defendant's objection to a prosecutorial comment in closing arguments is reversible error. A reviewing

court must initially determine whether the comment was improper. If so, the court must then determine whether the improper comment was so prejudicial that real justice was denied or the verdict resulted from the error. [Citation.] A trial court's decision to overrule an objection to a comment in prosecutorial closing argument will not be overturned absent an abuse of discretion." *People v. Williams*, 2022 IL 126918, ¶ 41.

¶ 78    Based on the supreme court's statement in *Williams*, it appears to us that the State's reconciliation of *Blue* and *Wheeler* is correct. The trial court's overruling of an objection to a comment in closing argument is reviewed for an abuse of discretion, while the question of whether an improper closing argument was sufficiently prejudicial to require reversal is reviewed *de novo*.

¶ 79    Our standard of review is further complicated in this case by the fact that Mr. Aldridge has forfeited this issue by making an actual objection to only one of the several comments he cites on appeal and by not making any claim regarding the closing argument in his post-trial motion. See *People v. McLaurin*, 235 Ill. 2d 478, 485 (2009) ("to preserve a claim of error for review, counsel must object to the error at trial *and* raise the error in a motion for a new trial before the trial court" (emphasis added)).

¶ 80    Mr. Aldridge asks that we review this issue under the plain-error doctrine, which allows us to review a forfeited claim where a clear or obvious error occurred and (1) "the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error" or (2) "the error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." (Internal quotation marks omitted.) *People v. Pacheco*, 2023 IL 127535, ¶ 55. "Whether there is plain error is a question of law, which we review *de novo*." *Williams*, 2022 IL 126918, ¶ 48. The first step in plain-error review is determining whether an

error occurred (*id.* ¶ 49), and to do that, we begin by looking at the challenged comments in the full context of the parties' closing arguments.

¶ 81    In its closing, the State discussed the evidence from Ms. Welsh, Ms. Walton, Mr. Huddleston, and Ms. Randle, saying:

> "All those identifications back from 2014 that they sure seemed to want to distance themselves from when they came in here in 2022, Khalia Welsh, Mark Hall's girlfriend, Katina Walton from the neighborhood, Devin Huddleston, friend, Theresa Randle, Devin Aldridge's girlfriend, why are they trying so hard to distance themselves from identifying the person that they know? Why? Because the person that they identified in those pictures, in those videos, in those flyers, Devin Aldridge, Mark Hall, are partners in crime.

> Now, when you look at the time frame, 2014, right after the 6 to 8 months after the murder, why would they identify them back in 2014, when they are distancing from it now? Well, what was happening in 2014? The detectives were looking for investigative leads. They weren't—the witnesses weren't there to say I saw him shoot. I saw him with a gun. They were looking at the video. They are looking at the flyers and saying I know that guy. I've dated that guy for eight years. I've known that guy since—all my life. So benign back then. Right? Fast forward to 2022, not so benign any more when they are here testifying in the murder trial of Devin Aldridge. And you sure did hear a lot of 'I don't recall. I don't recall. No. I don't recall.' You no [*sic*] why? You know what that is? That's an apology to Devin Aldridge for making that prior identification in 2014."

¶ 82    In her argument, defense counsel attacked the State's assertions about and the credibility of the recanting witnesses:

"And [the State] may argue, I don't know, that perhaps from the witness stand, they are

22

nervous because they are confronting the people that they have identified. But let's think about how this happened.

Devin Aldridge is not arrested until August of 2014. These people all talk to the State before that. So if they were going to be nervous, wouldn't it have been back then when they were in the neighborhood, lived in the community, knew his mother, knew his friends and him. Not nine years later when they all are out of the neighborhood, have moved on, have jobs and don't live there anymore. What we can say for certain is that they are liars. The State put on a bunch of liars for you, and they are asking you to convict someone of first degree murder of two people based on the testimony of liars.

And how do you know they are liars? Because they were under oath then and they were under oath now. They are just asking you which version to believe, and if that's the choice you have to make, and that's really the only evidence they have here, then that choice should be clear for you."

¶ 83    In rebuttal, the State argued:

"[THE STATE]: Counsel also talks about all of the liars that got on this stand. All of those witnesses that got up on this stand have one thing in common. They are all friends with the defendant, and they all have similar stories up here because they are trying to back their way out of the fact that now they are ratting on their friends. They don't want to come in here and look a cold-blooded killer and, say, yep, that's him.

[DEFENSE COUNSEL]: Objection.

THE COURT: Overruled.

[THE STATE]: No. They don't. But when they were walking down the street and asked to look at the flier and the defendant wasn't staring at them, oh, yes, I know that guy.

23

He's my boyfriend. Oh, yes, I know that guy, I hang out with him all the time. Oh, yes, I know the defendant. They didn't know the defendant. They didn't know why they were looking at this flier. They just said who is this? Some guy in the neighborhood. A guy I hang out at the mall with. It's Lemon. And I want you to consider the witness' [*sic*] demeanor on the stand.

\* \* \*

These witnesses got to these places, came to this building, went to the police station on their own. There's one key thing that is different from then till now, it's the defendant. He's 20 feet away from them. That's the important difference. That's the one key thing. They don't want to look at him. They don't want to rat out their friend. They don't want to do it to his face. It's much easier to talk about their friend behind their back, then [*sic*] it is to talk about them in their face."

¶ 84    Reading the arguments in context, it appears that the State connected the recanting to the witnesses' relationships with Mr. Aldridge, rather than to a fear of retaliation. The State highlighted the relationship each recanting witness had with Mr. Aldridge—Mr. Hall's girlfriend, someone from the neighborhood, a friend, Mr. Aldridge's girlfriend—and then suggested that there was a significant difference between identifying someone you have a relationship with on a flyer and identifying that same person while looking at him in court.

¶ 85    Mr. Aldridge argues that the State's closing painted him "as a scary, violent man who should be sent to prison" and that the witnesses who recanted "felt a need to apologize because [Mr.] Aldridge had threatened or pressured them into recanting and they did not want to risk retribution from [Mr.] Aldrige or someone [Mr.] Aldridge sent after them." But at no point in its initial argument did the State suggest the witnesses were afraid or felt threatened. In fact, it was

24

the defense that injected this possibility when it suggested in its own closing argument that the State might argue the recanting witnesses were "nervous because they are confronting the people that they have identified."

¶ 86    The only comment of the State's that *could* have suggested the recanting witnesses were afraid of Mr. Aldridge is when, in rebuttal, the prosecutor said, "They don't want to come in here and look a cold-blooded killer and, say, yep, that's him." This is the one comment that Mr. Aldridge objected to at trial and thus the only comment on which we have a ruling from the trial court which overruled that objection, and we do not find that ruling to be an abuse of discretion.

¶ 87    That comment was made in rebuttal and could reasonably be seen as a response to defense counsel arguing that the witnesses had no reason to be concerned about their testimony by the time of trial, when they had all left the neighborhood. See *People v. Kitchen*, 159 Ill. 2d 1, 39 ("The prosecutor may respond to comments by defense counsel which clearly invite a response."). Moreover, this was one passing comment and, looking at the rebuttal argument as a whole, the State's focus remained on the witnesses' relationships with Mr. Aldridge and the suggestion that, given the closeness of those relationships, they did not want to identify him when he was present.

¶ 88    Mr. Aldridge also argues that the State's comments were improper because they gave the jurors "an excuse to disregard the recantations in favor of the original statements to law enforcement." But when faced with conflicting statements from the same witness, the jury must necessarily decide which to believe. It was entirely proper for the State to draw the jurors' attention to any reasonable inference—including that the witnesses' close ties with Mr. Aldridge may have made it difficult for them to accuse him face-to-face—that would make the recanted statements more credible in the jurors' eyes than the witnesses' testimony at trial.

¶ 89    Mr. Aldridge relies on *People v. Mullen*, 141 Ill. 2d 394, 405 (1990), for the proposition

25

that "[p]rosecutorial comments suggesting [ ] witnesses were afraid to testify because [the] defendant had threatened or intimidated them, when not based on any evidence in the record, are 'highly prejudicial and inflammatory.' " The prosecutor in *Mullen* did not simply draw a reasonable inference from the evidence but, rather, claimed—with *no* supporting evidence in the record—that the "the witnesses were reluctant to testify because they were afraid that the defendant would shoot them in the back if they did so." *Id. Mullen* is not the same as this case.

¶ 90 Finally, we note that, even if the State's comments had been improper, proper jury instructions can be sufficient to cure improper arguments, as the "[a]rguments of counsel generally carry less weight with a jury than do instructions from the court." *People v. Lawler*, 142 Ill. 2d 548, 564 (1991) (quoting *Boyde v. California*, 494 U.S. 370, 384 (1990)). As our supreme court explained in *Williams*, "[a]n error in closing argument is not a typical trial error in that it does not involve the admission of inculpatory evidence or the rejection of exculpatory evidence but rather commentary on the evidence that has been presented. That is why juries are told that closing arguments are not evidence and 'any statement or argument made by the attorneys which is not based on the evidence should be disregarded.' " *Williams*, 2022 IL 126918, ¶ 40 (quoting Illinois Pattern Jury Instructions, Criminal, No. 1.03 (2011)).

¶ 91 Because we do not find the prosecutor's comments in closing or rebuttal were improper, we find no error, and thus no plain error.

¶ 92                              IV. CONCLUSION

¶ 93 For the foregoing reasons, we affirm the judgment of the trial court.

¶ 94 Affirmed.